Robert CARTER et al., Plaintiffs-Appellants,

v.

WEST FELICIANA PARISH SCHOOL BOARD et al., Defendants-Appellees.

No. 29745.

United States Court of Appeals, Fifth Circuit.

Sept. 25, 1970.

Murphy W. Bell, Baton Rouge, La., for plaintiffs-appellants.

Jack P. F. Gremillion, Atty. Gen., State of Louisiana, Baton Rouge, La., Fred C. Jackson, Asst. Dist. Atty., Twentieth Judicial Dist. Court, St. Francisville, La., Richard H. Kilbourne, Dist. Atty., Clinton, La., for defendants-appellees.

Stephen J. Pollak, Anthony A. Lapham, Kenneth L. Penegar, David Rubin, Washington, D. C., for amicus curiae,

The National Education Assn.; Shea & Gardner, Washington, D. C., of counsel.

Gerald J. Gallinghouse, U. S. Atty., Jerris Leonard, Asst. Atty. Gen., David L. Norman, Deputy Asst. Atty. Gen., Brian K. Landsberg, David D. Gregory, Attys., Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., for the United States as amicus curiae.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Our opinion of August 14, 1970 is withdrawn and the following is substituted:

This school desegregation suit involving a small rural Louisiana parish was commenced July 22, 1965, resulting in the adoption of a Jefferson-model [1] freedom of choice decree in August 1967. Freedom of choice was held to be an unacceptable basis for student assignments in West Feliciana Parish as one of the cases consolidated sub nom. Hall v. St. Helena Parish School Board, 5 Cir. 1969, 417 F.2d 801, cert. denied 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969).[2]

On remand from Hall the district court approved a combination zoning-free choice plan which we reversed in the en banc school cases, Singleton v. Jackson Municipal Separate School District, 5 Cir. 1969, en banc, 419 F.2d 1211, 1220, reversed in part (as to timing of student reassignment) sub nom. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970).

The district court's order on remand from Hall contained no specific provision for faculty desegregation, although the school board represented that it would attempt to obtain voluntary teachers' transfers and if necessary would adopt additional means for desegregating faculties. The school board projected that 6 of the teachers would be assigned across racial lines. In Singleton, supra, we directed the reassignment of teachers and other staff so that the ratio of white to Negro teachers and staff in each school would approximate the ratio of white to Negro teachers and staff in the system as a whole. 419 F.2d 1218. That provision and the other uniform provisions of the Singleton decree were adopted by the district court on remand.

Because their requirements are critical to our decision here, we quote the full text of paragraphs 2 and 3 of the Singleton uniform provisions relating to desegregation of faculty, and other staff:

"2. Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.

"3. If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dis-

---

1. United States v. Jefferson County Board of Education et al., 5 Cir. 1967, en banc, 380 F.2d 385.

2. 734 white and 1760 Negro students were enrolled in parish schools during the school year 1968–69. As of that year 119 Negroes (6.7%) and no white students had exercised freedom of choice to cross racial lines. Of the 6 schools in the system 4 of them had an all-Negro student body and one had an all white student body. Of a total of 85 Negro and 44 white teachers, 3 Negroes taught in formerly all white schools and only 1 white teacher taught in a formerly all-Negro school. Hall v. St. Helena Parish School Board, supra, 417 F.2d at 819.

missed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

"Prior to such a reduction, the school board *will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district.* The school district also shall record and preserve the evaluation of staff members under the criteria. *Such evaluation shall be made available upon request to the dismissed or demoted employee.*

" 'Demotion' as used above includes any reassignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period." (Emphasis supplied)

Approximately 100 to 150 students withdrew from school during the 1969–70 school year as a continuation of a downward trend in enrollment for several years. As a result the school board anticipated the probable need to reduce the system's teaching staff for the opening of schools in September 1970. As one of the bases upon which to determine which teachers should not be rehired in the event dismissals become necessary the school board proposed to administer subject-matter achievement tests of the National Teachers Examination.[3] It was proposed that the results of such tests would constitute one criterion for the evaluation of all teachers. Other considerations would include subjective evaluation by supervisory personnel and length of service. Supervisory personnel would be called upon to determine "the ability of the teacher to communicate, the discipline in the class, the manner of the teacher, his display of knowledge of the subject matter, his methods, techniques". No predetermined weight was given for the various factors to be considered.

The controversy before us arose from the school board memorandum directive dated April 28, 1970, to all teachers in the system from the Superintendent of Schools indicating that teachers would be required about May 1, 1970, to take the NTE test in the area of their individual certification "as a part of [the West Feliciana Parish School Board's] teacher evaluation program for the 1969–70 school year". On motion of the plaintiffs-appellants the trial court temporarily restrained the administration of the

---

3. The nature of the testing program was quoted by the plaintiffs-appellants' expert witness from "NTE: Prospectus for School and College Officials 3 (Educational Testing Service 1967)" as follows:

"The purpose of the NTE program while significant, is limited to assessment of those aspects of teacher education that are validly and reliably measured by well-constructed objective paper and pencil tests. The examinations do not measure manual skills which are essential elements in the education of teachers in such fields as art, industrial arts, music and physical education. Nor does the test claim to assess such elements as teaching [aptitude], interest, attitude, and personal social characteristics. Moreover the NTE [is] not intended as a measure of classroom teacher performance. Those desiring to evaluate teachers in service will not find the National Teachers Examination a substitute for direct observation of their on-the-job accomplishments. The National Teachers Examination then helps to provide answer to the question: What does the prospective teacher know. The tests do not furnish broad or easy answers to other important questions, including what kind of person is the prospective teacher or can the prospective teacher function effectively in a classroom."

It will be seen from the quotation that the NTE purports merely to measure academic achievement, or subject knowledge, of prospective teachers.

tests by an order of April 29, 1970, and held an evidentiary hearing on May 4, 1970 upon the application to make the injunctive order permanent.

The court below, after hearing evidence, declined to grant the permanent injunction sought, and dissolved the temporary restraining order.[4] This appeal followed.

■ A member of this Court on May 7, 1970, entered an order temporarily restraining administration of the NTE tests. That order was set aside by us on May 14, 1970, when we entered an order permitting administration of the tests [5] before the end of the school term, May 29, 1970 (the most practicable time for giving the tests) but providing that their results be not disclosed and be not used as a criterion in determining the release of any in-service teacher until disposition by a panel of the court of the appeal and authorization thereunder to the school board to use the tests as one of the criteria in determining which teachers should be released. The case was set for expedited argument before this panel on June 10, 1970. In addition to briefs of the parties, we have been furnished with amicus curiae briefs of the National Education Association and of the Civil Rights Division of the United States Department of Justice, the latter filed at the Court's express invitation. We reverse because of a misconception on the part of the district court as to the requirements of *Singleton* relating to the dismissal of teachers.

This misconception is apparent from the findings of facts and the conclusions of law of the district court. For example, in Finding of Fact No. 16 the district court stated, in answer to the contention

that the test in question was discriminatory toward Negro teachers vis a vis white teachers, that there would be no such discrimination in view of the fact that dismissal of teachers was required to be made proportionately among white and Negro teachers so as to maintain the faculty assignment ratio between the two races. In Conclusion of Law No. 6, the district court stated that it would be necessary to allocate the lay off of teachers between white and Negro teachers so as to maintain the ratio between white and Negro teachers as required under the law and under the orders of the district court. In Conclusion of Law No. 7, the court stated that it would be necessary to compare grades of Negro teachers with other Negro teachers and those of white teachers with other white teachers in order to maintain the faculty assignment ratio at all times.

■ The district court was not construing its order per se but the *Singleton* language, supra, 419 F.2d 1217, 1218, which had been adopted by the district court on the remand of this case. The *Singleton* requirement which is also the requirement of the earlier decision of this court in United States v. Hinds County School Board, 5 Cir. 1969, 423 F.2d 1264, does not contemplate freezing the faculty ratio which is present when faculty desegregation takes place in the system. It contemplates rather that faculty desegregation will be accomplished by invoking the system-wide ratio as a rule for each particular school in the system and that thereafter the system will function from the standpoint of faculty and staff on the merit system. This means that once a unitary system has been established the system-wide racial ratio may

4. The opinion of the district court is not reported. It is contained in specific findings of fact and conclusions of law dictated into the record at the conclusion of the hearing. The portions of the findings and conclusions set out in the text are extracted from the reporter's transcript of that hearing.

5. We were informed by brief and orally by counsel during oral argument that

when the NTE tests were given on May 29, only one Negro teacher took them. This development raises some questions as to the mootness of the present appeal, but we conclude that the correctness vel non of the trial court's refusal to enjoin the tests remains a viable issue, preserved for and requiring our decision.

thereafter change from time to time as a result of non-discriminatory application of objective merit standards in the selection and composition of faculty and staff.

■ The key to the *Singleton* requirement, other than the initial ratio element, is that there is to be no racial discrimination in the operation of the merit system. Non-discriminatory objective and reasonable standards must be developed and used in the dismissal or demotion of teachers.

Here there was a surplus of teachers because of having converted from a dual to a unitary system. The school board developed various criteria for use in evaluating teachers for the purpose of selecting those teachers to be retained. These included a subjective evaluation by supervisory personnel to determine the ability of the teachers to communicate, to maintain discipline in the classroom, and knowledge of subject matter, methods and techniques. Lastly, each teacher was required to take the subject matter achievement tests of the National Teachers Examination. No predetermined weight was given to the various factors to be considered.

■ The burden of appellant's case is that the National Teachers Examination is discriminatory as between white and Negro teachers. This is the prime issue in the case and the question which must be considered by the district court on remand. The district court should enter findings of fact and conclusions of law regarding this issue after a full development of the facts. Findings of fact and conclusions of law should also be entered as to the objectivity and reasonableness of such other criteria as the school board is to use in reducing the faculty including whether such standards are non-discriminatory. For a case involving similar problems, see Harkless v. Sweeny Independent School District, 5 Cir. 1970, 427 F.2d 319.

The mandate shall issue forthwith. No stay will be granted pending petition for rehearing or application for certiorari.

Reversed and remanded, for further proceedings not inconsistent herewith.